**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:21-cv-

OTTER PRODUCTS, LLC and
TREEFROG DEVELOPMENTS, INC.,

      Plaintiffs,

v.

MENACHEM MENDEL ICHILEVICI,
ANDREA ICHILEVICI,
BENY ICHILEVICI,
TX TRADING INC., and
JOHN DOES 1-10, individually or as corporate/business entities,

      Defendants.

---

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND OTHER RELIEF FOR**
**VIOLATIONS OF 15 U.S.C. § 1114; 15 U.S.C. § 1125(a); 15 U.S.C. § 1125(c); AND**
**RELATED CLAIMS; AND JURY DEMAND**

---

Plaintiffs Otter Products, LLC and TreeFrog Developments, Inc. (collectively, "Plaintiffs")

bring this action against Defendants Menachem Mendel Ichilevici, Andrea Ichilevici, Beny

Ichilevici, TX Trading Inc., and John Does 1-10 (collectively, "Defendants") for trademark

infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 15 U.S.C. § 1125; false

advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); unfair competition in

violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); trademark dilution in violation of the

Lanham Act, 15 U.S.C. § 1125(c); common law trademark infringement; unfair and deceptive

business practices in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-

101 *et seq.*; and tortious interference with contract and business relations.  These claims arise from

Defendants' infringement of Plaintiffs' trademarks in connection with Defendants' unlawful and

unauthorized advertisement and sale of OtterBox®- and LifeProof®-brand products on the Internet, including the sale of poor quality products bearing the OtterBox® and LifeProof® marks. In support of their complaint, Plaintiffs allege as follows:

### PARTIES

1.      Plaintiff Otter Products, LLC ("Otter") is a Colorado limited liability company with its principal place of business in Fort Collins, Colorado.

2.      Plaintiff TreeFrog Developments, Inc. ("TreeFrog") is a Delaware corporation with its principal place of business in Fort Collins, Colorado.

3.      Defendant Menachem Mendel Ichilevici (hereinafter, "Mendel Ichilevici") is a natural person who, upon information and belief, resides at 20355 NE 34th Court, Apt. 427, Miami FL 33180.   Mendel Ichilevici operates or assists in the operation of a storefront on www.amazon.com ("Amazon") that is currently called "Mac N' Cheese" and can be accessed at: https://www.amazon.com/sp?seller= A2HKJDSYFUXLQL (the "Amazon Storefront").[1]  Mendel Ichilevici does business throughout the United States through the Amazon Storefront.

4.      Defendant Andrea Ichilevici is a natural person who, upon information and belief, resides at 20355 NE 34th Court, Apt. 427, Miami FL 33180.  Andrea Ichilevici operates or assists in the operation of the Amazon Storefront and does business throughout the United State through the Amazon Storefront.

5.      Defendant Beny Ichilevici is a natural person who, upon information and belief, resides at 20355 NE 34th Court, Apt. 427, Miami FL 33180.  Beny Ichilevici operates or assists in

---

[1] Although Defendants can change the name of their Amazon Storefront at will, every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.

the operation of the Amazon Storefront and does business throughout the United State through the Amazon Storefront.

6.      Defendant TX Trading Inc. is a corporation organized under the laws of Florida. According to corporate documents filed with the Florida Secretary of State, TX Trading Inc.'s mailing address and principal place of business are located at 20355 NE 34th Court, Apt. 427, Miami FL 33180.  TX Trading Inc. operates or assists in the operation of the Amazon Storefront and does business throughout the United State through the Amazon Storefront.

7.      Corporate documents filed with the Florida Secretary of State list Beny Ichilevici as the sole officer and director of TX Trading Inc.  Corporate documents also list Beny Ichilevici's home residence as the principal place of business of TX Trading Inc.  Accordingly, upon information and belief, Beny Ichilevici is a principal of, in control of, and primarily responsible for TX Trading Inc. and its actions.

8.      Plaintiffs assert claims against Beny Ichilevici in his individual capacity as well as his capacity as a corporate officer of TX Trading Inc.

9.      Until they conduct discovery, Plaintiffs cannot conclusively determine whether Beny Ichilevici in his individual capacity, TX Trading Inc., or both of these defendants assist in the operation of the Amazon Storefront.  Upon information and belief, both Beny Ichilevici in his individual capacity and TX Trading Inc. assist in the operation of the Amazon Storefront along with Mendel Ichilevici and Andrea Ichilevici.  On his profile on www.linkedin.com, Beny Ichilevici states that he and TX Trading Inc. sell "New and Used cell phones."

10.     Alternatively, Beny Ichilevici directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing OtterBox and LifeProof products by TX Trading Inc. Beny Ichilevici is responsible for and has knowledge of the infringing activities of TX Trading

Inc.  Accordingly, Beny Ichilevici is personally liable for the infringing activities of TX Trading Inc. without regard to piercing the corporate veil.

11.     Alternatively, TX Trading Inc. follow so few corporate formalities and is so dominated by Beny Ichilevici that it is merely an alter ego of Beny Ichilevici.

12.     TX Trading Inc. was created to carry out the tortious and infringing conduct alleged herein, and Beny Ichilevici has used TX Trading Inc. to perpetuate the tortious and infringing conduct alleged herein.

13.     For all of these reasons, it is a legal fiction that TX Trading Inc. is a separate personality from Beny Ichilevici, and adhering to that fiction would promote injustice and result in fundamental unfairness.  Accordingly, Plaintiffs are entitled to pierce the corporate veil of TX Trading Inc. and hold Beny Ichilevici personally liable for the infringing activities of TX Trading Inc.

14.     Plaintiffs believe that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Plaintiffs.  Therefore, Plaintiffs sue these Defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Plaintiffs will seek leave to amend this Complaint accordingly.  If Plaintiffs do not identify any such parties, they will dismiss these Defendants from this action.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338, and 28 U.S.C. § 1367.  Plaintiffs' federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and their claims arising under the laws of Colorado are

substantially related to their federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

16.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Colorado and established sufficient minimum contacts with Colorado by, among other things, advertising and selling infringing products bearing Plaintiffs' trademarks to residents of Colorado through one or more highly interactive commercial websites, through the regular course of business, with knowledge that Plaintiffs are located in Colorado and are harmed in Colorado as a result of Defendants' sales of infringing products to Colorado residents.  Defendants know that Plaintiffs are located in Colorado, among other reasons, because they received cease-and-desist letters that identified Plaintiffs as companies located in Colorado and notified Defendants that their unlawful actions are harming Plaintiffs in Colorado. After receiving letters from Plaintiffs, Defendants have continued to sell infringing products to residents of Colorado despite being put on notice of their illegal conduct and the pendency of this action.

17.     Defendants' regular sales of infringing products bearing Plaintiffs' trademarks into Colorado have included, but are not limited to, sales of two infringing products to Plaintiffs.  On or around April 15, 2020 and November 4, 2020, Defendants caused two infringing products to be delivered to Plaintiffs in Colorado after they were purchased from Defendants' Amazon Storefront.

18.     In addition to their sales to Plaintiffs, Defendants have also sold, and continue to regularly sell, a high volume of other infringing products bearing Plaintiffs' trademarks into Colorado and to Colorado residents.

19.     Through their advertising, marketing, sales, shipments, and distribution of infringing products in Colorado and to Colorado residents, Defendants could reasonably anticipate being brought into Court in Colorado.

20.     Plaintiffs' claims arise out of Defendants' sales of infringing products bearing Plaintiffs' trademarks to Colorado residents through the regular course of business.

21.     This Court also has personal jurisdiction over Defendants because, upon information and belief, Defendants are storing products bearing Plaintiffs' trademarks at "fulfillment centers" (*i.e.*, warehouses) within Colorado operated by Amazon.com Services LLC ("Amazon.com").   Defendants have elected to use Amazon.com's "Fulfillment By Amazon" service to store products at Amazon fulfillment centers prior to their purchase by consumers, and sellers who use the "Fulfillment By Amazon" service must enter into a contract that gives Amazon.com the right to store sellers' products as Amazon.com sees fit at fulfillment centers located around the country (including three fulfillment centers located in Colorado).   Given that Defendants are selling a high volume of products bearing Plaintiffs' trademarks and Colorado is a populous state, it is exceedingly likely that products bearing Plaintiffs' trademarks that Defendants own are being stored within Colorado prior to their purchase by consumers.

22.     Defendants are intentionally using Amazon.com's vast, established infrastructure to store and ship infringing products bearing Plaintiffs' Trademarks, and are paying Amazon.com for the privilege to do so through commissions and fees.

23.     Defendants are subject to the Court's personal jurisdiction with respect to this action pursuant to Colorado's long-arm statute, Colo. Rev. Stat. § 13-1-124(1)(a), because Colorado's long-arm statute confers personal jurisdiction to the maximum extent permitted by constitutional due process and, for the reasons set forth herein, the exercise of jurisdiction over

Defendants comports with due process requirements. Alternatively, Defendants are subject to personal jurisdiction under Colorado's long-arm statute as persons transacting business within the State of Colorado and as persons committing tortious acts within the State of Colorado, Colo. Rev. Stat. § 13-1-124(1)(a) and (1)(b).

24.     Venue is proper in this District and in this Division under, without limitation, 28 U.S.C. § 1391(b)(2)-(3), because a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### Plaintiffs And Their Trademarks

25.     Plaintiffs develop, manufacture, market, and sell premium mobile device, smartphone, and tablet cases and accessories, and outdoor products such as coolers and drybags, under the OtterBox® brand ("OtterBox Products") and LifeProof® brand ("LifeProof Products") (collectively, "Otter Products"). Plaintiffs sell Otter Products exclusively through their own websites and through a network of Authorized Distributors and Authorized Resellers (collectively, "Authorized Sellers").

26.     Plaintiffs permit Authorized Sellers to sell Otter Products in specific channels only and require Authorized Sellers to abide by applicable authorized seller policies and agreements relating to quality controls, customer service, and other sales practices (collectively, the "Otter Rules.")

27.     Plaintiffs devote a significant amount of time, energy, and resources toward protecting the value of the OtterBox and LifeProof brands, products, names, and reputation. By distributing Otter Products exclusively through their own websites and through Authorized Sellers who are required to follow the quality controls and other requirements in the Otter Rules, Plaintiffs are able to ensure the safety and satisfaction of consumers and maintain the integrity and reputation

of the OtterBox and LifeProof brands.  In the highly competitive mobile device accessories and outdoor products industries, quality, customer support, and warranties are fundamental to a customer's decision to purchase a product.

28.     To promote and protect the OtterBox brand, Otter has registered several trademarks with the United States Patent and Trademark Office, including, but not limited to:  OTTERBOX® (U.S. Trademark Reg. Nos. 5,439,652; 5,498,180; 4,602,221; and 3,788,534); DEFENDER SERIES® (U.S. Trademark Reg. No. 4,616,874); STRADA SERIES® (U.S. Trademark Reg. No. 4,864,518); STATEMENT SERIES® (U.S. Trademark Reg. No. 4,952,893); SYMMETRY SERIES® (U.S. Trademark Reg. No. 4,709,178); PURSUIT SERIES® (U.S. Trademark Reg. No. 4,280,846); ALPHA GLASS® (U.S. Trademark Reg. No. 4,702,961); VENTURE® (U.S. Trademark Reg. No. 5,449,981); TROOPER® (U.S. Trademark Reg. No. 5,496,963); and ELEVATION® (U.S. Trademark Reg. No. 5,444,887) (collectively, the "OtterBox Trademarks").

29.     To promote and protect the LifeProof brand, TreeFrog has registered numerous trademarks with the United States Patent and Trademark Office, including, but not limited to: LIFEPROOF® (U.S. Registration Nos. 4,519,288; 4,520,890; 4,360,963; and 4,057,201); LIFEJACKET® (U.S. Registration No. 4,354,783); LET'S GO!® (U.S. Registration No. 4,285,129); and FRE® (U.S. Registration No. 4,397,480) (the "LifeProof Trademarks").

30.     The registrations for the OtterBox Trademarks and LifeProof Trademarks (collectively, the "Otter Trademarks") are valid, subsisting and in full force and effect.

31.     Plaintiffs' right to use many of the Otter Trademarks has become incontestable under 15 U.S.C. § 1065 because the trademarks have been in continuous use, Plaintiffs received no final legal decision issued against the trademarks, and Plaintiffs timely filed a Section 15 Declaration describing the trademarks' use.  Accordingly, these trademarks serve as conclusive

evidence of Plaintiffs' ownership of the marks and of their exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

32.     Plaintiffs actively use, advertise, and market all of the Otter Trademarks in commerce throughout the United States.

33.     Consumers recognize the Otter Trademarks as being associated with mobile device cases and accessories and outdoor products on the leading edge of innovation, quality, and durability, in those industries.

34.     Because of the quality, reliability, and durability of Otter Products, consumers trust the OtterBox and LifeProof brands and associate the OtterBox and LifeProof names with high quality, reliable, and durable products.

35.     For all of these reasons, the Otter Trademarks are widely recognized by the general consuming public of the United States and Plaintiffs are recognized as the source of products bearing the Otter Trademarks.

36.     Due to the superior quality and exclusive distribution of Otter Products, and because Plaintiffs are uniquely recognized as the source of these high quality products, the Otter Trademarks have considerable value.

### Online Marketplaces And The Challenges They Present To Plaintiffs' Product Quality

37.     E-commerce retail sales have exploded over the past decade.  From 2009 through the third quarter of 2020, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.3%. *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (November 19, 2020), https://fred.stlouisfed.org/series/ECOMPCTSA.

38.     In 2020, consumers spent $861 billion on e-commerce sales, a 44% increase from 2019.  The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2020, United States consumers spent more than $296 billion in e-commerce sales on Amazon, a 38.6% increase from 2019.  *See* Fareeha Ali, *U.S. ecommerce grows 44.0% in 2020*, DIGITAL COMMERCE 360 (January 29, 2021),  https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

39.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

40.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

41.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

42.     Online marketplaces are overrun by unauthorized sellers—such as Defendants— who have no relationship with or obligations to brand owners who exercise quality controls over their products sold by authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through

brand owners' authorized channels. *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.   It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces. *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

43.     Third-party sellers on Amazon may also sell counterfeit items, or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

44.     For example, the Department of Homeland Security recently published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."  Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.  The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party

seller." *Id.* at 14-15, 38.  To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers." *Id.* at 35.

45.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine. *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

46.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online. *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

47.     In its 2018 and 2019 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See* Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x 10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020), *available at* https://ir.aboutamazon.com/static-files/63a014ac-bd47-42ce-b548-022a90d96e9a.     Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

48.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability to exercise control over the quality of its products presents serious risks to the satisfaction and safety of consumers.

49.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

50.     When purchasing products on an online marketplace, customers are not informed whether a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand: [name of brand]" immediately

under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

51.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

52.     When a customer purchases a product on a marketplace and receives a damaged, defective, expired, soon-to-expire, or other poor-quality product, the customer is much more likely to associate the problem product with the brand/manufacturer rather than the product seller.

53.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

54.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

55.     Consumers place extraordinary trust in these online reviews.  Indeed, consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *Moms Place Trust in Other Consumers*, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

56.     Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces. Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness .com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

57.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  Graham Charlton, *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011, https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

58.     Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

### Sales of Poor Quality Otter Products on Online Marketplaces Have Caused Consumers to Write Numerous Negative Reviews of Plaintiffs and Otter Products

59.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products and leave negative reviews on product listings. These negative reviews injure consumer perceptions of the brand's quality and reputation, as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

60.     Plaintiffs have been the subject of numerous online marketplace reviews from customers who purchased Otter Products of poor quality.  These customers complain of receiving

products that were damaged, defective, previously used, counterfeit, or of otherwise poor quality and give Otter Products a 1-star rating, reducing products' average rating and reputation.

61.     For example, on January 22, 2021, Amazon user "Austin" complained that he purchased an Otter Product on Amazon that was previously used when he received it.



62.     Also on January 22, 2021, another Amazon customer complained that he purchased an Otter Product on Amazon that was missing components: "Half of the phone case was missing. Directions indicated there were two parts but only one was included in the order."



63.     On August 21, 2020, Amazon user "Brandi O'Connor" complained that an Otter Product she purchased on Amazon was "completely scratched up well used and definitely abused. Not to mention the phone case was absolutely Filthy!"  She described it as the "Worst purchase on Amazon to date!  Nasty!"



64.     On August 14, 2020, Amazon user "Jim Angel" complained that an Otter Product he purchased on Amazon was damaged when he received it: "So much for 'lifeproof!  The item arrived chipped/with a piece broken off."



65.     On June 29, 2020, Amazon user "Jerry" complained that an Otter Product he purchased on Amazon was missing components and previously used: "The product was unsealed and only the back of [the] otter was received.  The other half is missing.  Disappointed when I pay a lot of money for it don't even get what I paid for."



66.     On June 9, 2020, Amazon user "Natania Wood" complained that an Otter Product she purchased on Amazon was damaged when she received it: "The case came out of the package already scratched.  It is definitely NOT 'scratch-proof!'"  She described the sale as "False advertising."

17



67.     On February 19, 2020, Amazon user "Jesse" complained that an Otter Product he purchased on Amazon came in a "package [that] looked like it was already open!" and was missing components.  He complained that he had "wasted" sixty dollars on a product that was most likely used, and urged other consumers to "[l]isten to the negative reviews !"



68.     On February 17, 2020, Amazon user "Joseph Culbertson" complained that an Amazon Product he purchased on Amazon was "obviously used and [a] broken piece of junk, has a broken part taped to the inside of the box."  He lamented that his purchase was "obviously a return that was shipped out as new product."



69.     On February 2, 2020, Amazon user Natalie Altamore complained that an Otter Product she purchased on Amazon "was clearly used . . . [c]ame in an opened box && has scratches on it."

18



70.     On January 27, 2020, an Amazon customer complained that an Otter Product he purchased on Amazon was "beat up" when he received it.  He exclaimed: "Come on Otter Box!  I spent $42 on a case… I expect it to be new!  Too much to ask?"



71.     On October 16, 2019, Amazon user "Amy S." cautioned other consumers to "beware!" because an Otter Product she purchased on Amazon was "used and broken" when she received it.  She remarked that she was "[v]ery disappointed."



72.     On June 21, 2019, Amazon user "Diane R." complained that an Otter Product she purchased on Amazon "came like it had been used before.  Scratches were on the back.  The camera piece was cracked and missing the black covering."



73.     On May 28, 2019, Amazon user "Kramer" complained that an Otter Product he purchased on Amazon was "[h]orrible" because the "Top case(screen cover piece) is bent into a u shape.  Will not close.  Will not seal."  He explained that he "bought one from Best Buy and it was perfect.  I think they r selling all the defective ones on amazon."



74.     On March 12, 2019, Amazon user "Keila" warned that the Otter Product she ordered was "fake," "counterfeit," "came broken," and was "just plastic made to look like OtterBox and won't protect your phone from what it's supposed to do!!"



75.     On December 22, 2018, Amazon user "Lisa *a mommy*" complained that her product was fake and "[c]ame with no packaging from Otterbox."



76.     On March 18, 2018, an Amazon Customer complained that the product received did not fit the iPhone 8 as the product listing purported: "Seriously disappointed in Otterbox.. . . . This case DOES NOT fit the iPhone 8.  It says it does but the case does not properly fit the 8."

| ☆☆☆☆☆ **DOES NOT FIT IPHONE 8** |
|---|
| By Amazon Customer on March 18, 2018 |
| Color: AQUA MINT WAY (AQUA MINT/MOUNTAIN RANGE GREEN)   Verified Purchase |
| Seriously disappointed in Otterbox.. I've ordered many of their products in the past and have been extremely pleased. This case DOES NOT fit the iPhone 8. It says it does but the case does not properly fit the 8. I was unaware that the 8 is slightly larger than the 7 and the ad does not specify that. Please save yourself the time and money and do not buy this for the iPhone 8! |

77.     On November 21, 2017, Amazon user "Kathryn Wade" complained that she received a poor quality product:  "STUNK like chinese chemicals (even though both inner rubber shell and outer hard plastic said MADE IN USA. . . .otterbox is going cheap now…older models of their cases did NOT stink like chinese chemicals."

⭐☆☆☆☆ **junk! stinks like chemicals, doesnt fit iphone8 correctly.**
By Kathryn Wade on November 21, 2017
Color: BLACK   |   Verified Purchase

STUNK like chinese chemicals (even though both inner rubber shell and outer hard plastic said MADE IN USA.
thought they claim it fits iphone8, it doesnt fit well. its really their iphone7 case, and iphone8 is LARGER than 7. its 0.1mm longer and 0.2mm wider and thicker so the hard plastic shell doesnt fit snug over the inner stinky rubber one. there are gaps all over. otterbox is going cheap now...older models of their cases did NOT stink like chinese chemicals. you can tell they changed something too in the look and feel of the rubber inner. i compared it with my wifes older iphone6 otterbox...the older ones were MUCH better, fit snug, and did not STINK like chinese toxic chemicals.

78.     On October 21, 2017, Amazon user "Robert Holland" complained that he received a damaged, poor quality Otter Product: "Cracked the first week I had it.  The hard outer case split.  Never saw anything like it.  Makes me think it is not a genuine Otterbox but instead a cheap copy.  Very dissatisfied."



⭐☆☆☆☆ **Cracked in first week**
By Robert Holland on October 21, 2017
Color: BESPOKE WAY (BLAZER BLUE/STORMY SEAS BLUE)   |   Verified Purchase

Cracked the first week I had it. The hard outer case split. Never saw anything like it. Makes me think it is not a genuine Otterbox but instead a cheap copy. Very dissatisfied.

79.     The foregoing reviews are only a small sample of the negative reviews of Otter Products that appear on the Amazon website.

80.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review. Given that Defendants have sold a high volume of products bearing the Otter Trademarks on Amazon and are not subject to Plaintiffs' quality controls, however, it is likely that some of the foregoing negative reviews—and the many similar reviews of Otter Products that appear on the Amazon website—were written by customers who purchased products bearing the Otter Trademarks from Defendants.

**Plaintiffs Have Implemented Strict Quality Controls To Combat The Problems Presented By The Online Marketplaces, Protect The Value Of Their Trademarks, And Ensure Customers Receive The Genuine, High Quality Products They Expect From Plaintiffs**

81.     The above reviews show how sales of poor quality Otter Products disappoint Plaintiffs' consumers and cause significant harm to Plaintiffs' reputation and goodwill.  To protect themselves and consumers from these harms, Plaintiffs implemented a quality control program

that applies to all of their Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

82.     The goal of Plaintiffs' program is to ensure that consumers who purchase Otter Products receive products that feature all of the special characteristics that consumers have come to expect from products sold under the OtterBox and LifeProof names – including the Otter warranty, quality, and reliability.

83.     The program seeks to minimize the likelihood that poor quality products will reach consumers.  By preventing consumers from receiving poor quality products, the program protects consumers from confusion and unsafe products as well as the value and goodwill associated with the OtterBox and LifeProof brands.

84.     Plaintiffs abide by their quality control requirements.  Moreover, as discussed below, Plaintiffs require their Authorized Sellers to abide by their quality-control requirements and audit their Authorized Sellers to ensure that they comply.

85.     Plaintiffs' ability to exercise their quality controls is essential to maintaining the integrity, safety, and quality of Otter Products, as well as the value of the Otter Trademarks and other intellectual property.

**Authorized Sellers Must Adhere to Plaintiffs'
Quality Control And Customer Service Requirements**

86.     Plaintiffs maintain strict quality controls over Otter Products by selling their products exclusively to customers directly through their websites and their network of Authorized Sellers.

87.     The Otter Rules limit to whom and where Authorized Sellers may sell Otter Products.  To prevent third parties from acquiring and reselling Otter Products, the Otter Rules permit Plaintiffs' Authorized Distributors to sell Otter Products only to Authorized Resellers that

are approved by Plaintiffs. Plaintiffs permit Authorized Resellers to sell Otter Products only to end-user consumers and Authorized Resellers are specifically prohibited from selling products to other resellers or anyone who intends to resell the products.

88.     Authorized Sellers are also prohibited from selling products on unauthorized websites, including third-party marketplaces such as Amazon, eBay, Jet, Rakuten, Walmart Marketplace, Sears Marketplace, or Craigslist, without prior written consent of Plaintiffs.

89.     These restrictions are essential to Plaintiffs' ability to exercise their quality controls over Otter Products because they allow Plaintiffs to know which of their Authorized Sellers are approved to sell online and where their Authorized Sellers are selling online.  If a quality issue arises through an online sale, Plaintiffs can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately.  Plaintiffs are unable to take such action against unauthorized sellers because they do not know who these sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

90.     In addition to restricting where and how Authorized Sellers can sell Otter Products, the Otter Rules also require Authorized Sellers to adhere to Plaintiffs' quality control requirements related to the inspection, handling, and storage of Otter Products.

91.     To ensure that customers receive the genuine and high-quality products they expect from Plaintiffs, the Otter Rules require that Authorized Sellers inspect all Otter Products for damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory.  Authorized Sellers are prohibited from selling damaged or defective products. Further, to assist Plaintiffs in identifying any product quality issues, Authorized Sellers are required to report any defects to Plaintiffs.

92.     The Otter Rules also require that Authorized Sellers store Otter Products in accordance with guidelines issued by Plaintiffs. This requirement helps ensure that Otter Products are stored properly and are not damaged prior to being shipped to the consumer.

93.     To avoid consumer confusion and ensure that customers receive genuine Otter Products, Authorized Sellers are prohibited from relabeling, repackaging, or altering Otter Products unless instructed by Plaintiffs.  Authorized Sellers must not remove, translate, or modify the contents of any label or literature on or accompanying Otter Products unless instructed by Plaintiffs.  Further, Authorized Sellers are prohibited from tampering with, defacing, or otherwise altering any identifying information on Otter Products, including any serial number, UPC code, or other identifying information.

94.     Plaintiffs also ensure that consumers receive safe products by requiring that Authorized Sellers assist with recalls and other consumer safety information efforts.  Specifically, Authorized Sellers must cooperate with Plaintiffs with respect to a product recall, consumer safety information dissemination effort, serial number scanning policy, and other product tracking programs.

95.     The Otter Rules also require that Authorized Sellers provide certain services to their customers.  Authorized Sellers must familiarize themselves with the features of all Otter Products kept in their inventory.  This requirement ensures that Authorized Sellers are uniquely qualified to recommend the Otter Products best suited for end-user consumers' needs.

96.     Plaintiffs' quality control requirements are legitimate and substantial and have been implemented so that Plaintiffs can control the quality of goods manufactured and sold under the Otter Trademarks, so as to protect consumers, as well as the value and goodwill associated with the Otter Trademarks.

97.     Plaintiffs' quality control requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality products.  Consumers would find it material and relevant to their purchasing decision to know whether an Otter Product they were considering buying was being sold by an Authorized Seller who is subject to Plaintiffs' quality control requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, Plaintiffs' quality controls and over whom Plaintiffs are unable to exercise their quality controls.

**Given The Flood Of Poor Quality Products On Online Marketplaces and Consumers' Inability To Inspect Such Products Before Purchase, Plaintiffs Impose Additional Requirements On Their Authorized Sellers Who Sell Online**

98.     As shown in consumer reviews cited above, *see supra*, ¶¶ 61-78, Otter Products sold online are more susceptible to quality and authenticity problems as consumers cannot see products at the time of purchase.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.

99.     Given these heightened risks to consumer satisfaction and the value of their trademarks that are posed by online sales, Plaintiffs impose additional quality control requirements on all of their Authorized Sellers who sell Otter Products online.

100.    Except for a small subset of Authorized Sellers who purchase Otter Products directly from Plaintiffs for retail sale on their own websites, Authorized Sellers are permitted to sell Otter Products online if they submit an application, pass Plaintiffs' vetting, and obtain Plaintiffs' permission to sell on specific websites and marketplace storefronts.  Authorized Sellers who are approved by Plaintiffs to sell Otter Products online are "Authorized Online Sellers."

101.    Authorized Online Sellers are vetted by Plaintiffs to ensure that they meet Plaintiffs' criteria and that they will properly represent the OtterBox and LifeProof brands.

102.     Critical to Plaintiffs' ability to exercise their quality controls over products sold online is that Plaintiffs must know where their Authorized Online Sellers are selling online, and if they are selling on an online marketplace, under what storefront names.  Accordingly, Authorized Online Sellers are prohibited from selling anonymously and must clearly state their business name and current contact information on all websites where they sell.  This requirement allows Plaintiffs to verify their Authorized Online Sellers and to immediately address any quality issues or negative reviews that arise.

103.     To be approved by Plaintiffs, Authorized Online Sellers must have an appropriately registered and recognized business that meets applicable criteria (i.e. credit, sales history, facility requirements).

104.     Authorized Online Sellers must also have an acceptable online review history, without a significant presence of negative product or seller reviews.

105.     Authorized Online Sellers must also have an acceptable business operating record, which includes evaluating, among other things, any lawsuits, complaints, or actions related to the delivery of damaged products, misrepresented products, poor quality products, or other similar issues.

106.     In addition to complying with the quality controls and customer service requirements discussed above, Authorized Online Sellers must also adhere to several additional requirements.

107.     Authorized Online Sellers must comply with all applicable data security, accessibility, and privacy requirements.

108.     Authorized Online Sellers must agree not to represent or advertise any product as "new" that has been opened or repackaged.  Typically, if a customer returns a product that was

purchased through a marketplace, the marketplace will repackage the product and allow it to be relisted as new. Plaintiffs prohibit their Authorized Online Sellers from allowing this to occur in order to ensure that customers receive the high quality Otter Products they expect.

109.    Unless otherwise approved by Plaintiffs, Authorized Online Sellers must agree to not fulfill orders in any way that results in the shipped product not coming from product stock in the Authorized Online Sellers' possession. Plaintiffs must review and approve any use of third-party fulfillment services.

110.    Authorized Online Sellers must also cooperate with any product tracking Plaintiffs implement or utilize.

111.    Authorized Online Sellers must have a mechanism for soliciting customer feedback/reviews and must take appropriate steps to address that feedback. Authorized Online Sellers must also cooperate with Plaintiffs in investigating any negative product reviews. Again, this is a critical component of Plaintiffs' quality control program because it allows Plaintiffs to quickly address quality issues that arise, which they are unable to do for products sold by unauthorized sellers like Defendants.

112.    Authorized Online Sellers who sell on Amazon must prevent the commingling of their Otter Products with the products of other sellers in Amazon warehouses and must prevent orders from being fulfilled in any way that potentially results in delivery to the consumer of a product from another seller's stock. This requirement is crucial to ensuring that consumers who purchase products through Authorized Online Sellers receive genuine Otter Products. Most sellers who store products in Amazon's warehouses allow their products to be commingled with other sellers' inventory. As such, when a consumer purchases a product through a particular storefront, the consumer could receive a product that came from the inventory of a number of different sellers,

including a product that is counterfeit.  Plaintiffs' anti-commingling quality control requirement prevents this from happening and ensures that the Otter Products that are sold by their Authorized Online Sellers are products that were distributed through Plaintiffs' authorized channels and comply with Plaintiffs' quality controls.

113.    To further their efforts and ability to assure product quality and adherence to their quality control standards, protect the value and goodwill associated with the Otter brand, and to prevent consumer confusion about the source of products consumers purchase, Plaintiffs have approved a very limited number of Authorized Online Sellers on the Amazon marketplace.  This limitation allows Plaintiffs to closely monitor seller and product reviews and to promptly address any product quality issues directly with their approved sellers.  This limitation also helps prevent the confusion that exists when consumers are presented with many marketplace sellers and are unable to discern which sellers are authorized and which are selling products that are subject to and protected by Plaintiffs' quality controls.

114.    The additional quality control requirements that Plaintiffs impose on their Authorized Online Sellers are legitimate and substantial and have been implemented to allow Plaintiffs to carefully control the quality of Otter Products that are sold on the Internet and address any quality issues that arise.

115.    These quality controls are also material, as they have been implemented to ensure that consumers who purchase Otter Products on the Internet receive genuine, high-quality Otter Products that abide by Plaintiffs' quality controls.  Consumers purchasing Otter Products on the Internet would find it relevant to their purchasing decision to know whether the product they are purchasing is vended by an Authorized Online Seller who is subject to, and abides by, Plaintiffs' quality controls.

**Plaintiffs Monitor and Audit Their Authorized Online Sellers**
**To Ensure They Comply With Plaintiffs' Quality Control Requirements**

116.    To ensure that their Authorized Online Sellers are adhering to their quality control requirements, Plaintiffs regularly monitor and audit Authorized Online Sellers and their websites to ensure they are complying with Plaintiffs' quality control requirements.  Plaintiffs carry out these auditing and monitoring actions pursuant to an internal program called the Otter Products, LLC Online Quality Control Auditing Program ("Auditing Program").

117.    As part of their Auditing Program, Plaintiffs examine every marketplace storefront and website through which they have approved an Authorized Online Seller to sell Otter Products ("Approved Website") each quarter to ensure that the Authorized Online Sellers who sell through these websites are complying with the Otter Rules.  During these examinations, Plaintiffs check to make sure that, among other requirements, the websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Plaintiffs or a third party; (iii) do not display any content that could be detrimental to the OtterBox or LifeProof brands; (iv) do not make any representations regarding Otter Products that are misleading; (v) exclusively contain images of Otter Products and product descriptions that are supplied or authorized by Plaintiffs and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

118.    Each quarter, Plaintiffs also inspect online reviews of Otter Products and Authorized Online Sellers that appear on Approved Websites.  If Plaintiffs discover reviews asserting that Authorized Online Sellers provided poor customer service, sold poor quality Otter Products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Plaintiffs communicates with the responsible

Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

119.    Each quarter, Plaintiffs also conduct a test purchase of an Otter Product from each Approved Website.  If Plaintiffs discover any quality problems in purchased products or discover that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Approved Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Plaintiffs communicate with the responsible Authorized Online Seller and take any necessary corrective action.

120.    Through its Auditing Program, Plaintiffs may visit the facilities of their Authorized Online Sellers to confirm that all of their quality control requirements are being followed and that Authorized Online Sellers are not selling any counterfeit Otter Products.

121.    If Plaintiffs discover that an Authorized Online Seller is selling Otter Products of poor quality or otherwise not adhering to Plaintiffs' quality control or customer service requirements, Plaintiffs conduct an investigation to determine the source of the problem.  The Otter Rules require that Authorized Online Sellers cooperate with Plaintiffs' investigation, permit Plaintiffs to inspect their facilities and records relating to Plaintiffs' products, and disclose all information about where they obtained Otter Products.  Based on what their investigation reveals, Plaintiffs have the right to cease selling their products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Otter Products.

122.    Plaintiffs also monitor sales of Otter Products by: (1) sending "white lists" to their authorized distributors each day that list all Authorized Sellers to whom distributors are permitted to sell Otter Products; and (2) requiring their authorized distributors to send "sell-through" reports

to Plaintiffs each week that list every purchaser to whom they have sold Otter Products.  By comparing these lists, Plaintiffs monitor and ensure that distributors do not sell any products to unauthorized resellers who are outside of Plaintiffs' quality controls.

**Genuine Otter Products Come With A Limited Warranty;**
**Defendants' Products Do Not**

123.    Otter Products purchased from Plaintiffs and their Authorized Sellers come with the OtterBox or LifeProof Limited Warranty (the "Otter Warranty").

124.    The Otter Warranty warrants Otter Products against defects in manufacturing, material, or workmanship under normal use and service for the applicable warranty period, subject to the conditions contained therein.  The warranty period ranges from one year to seven years depending on the product.

125.    Pursuant to the Otter Warranty, a customer can receive a repair or replacement product if a product has a defect in manufacturing, materials, or workmanship during the warranty period applicable to the product.  The complete Otter Warranty statements can be viewed on the OtterBox and LifeProof websites.  *See OtterBox Global Limited Warranty ("Limited Warranty"), available at* https://www.otterbox.com/en-us/warranty-full.html; *LifeProof Global Product Warranty, available at* https://www.lifeproof.com/en-us/global-warranty.html.  Such statements are incorporated herein.

126.    Plaintiffs extend the Otter Warranty only to products that were sold by sellers who are subject to Plaintiffs' quality controls.  Because products sold by unauthorized sellers are not subject to Plaintiffs' quality controls and Plaintiffs cannot ensure the quality of such products, Plaintiffs do not extend the Otter Warranty to products sold by unauthorized sellers, including Defendants.  Indeed, the Otter Warranty specifically states: "This Limited Warranty will apply only to Products purchased from an Otter-authorized dealer that is subject to and follows Otter's

quality controls . . ." and ". . . this Limited Warranty does not, under any circumstances, cover . . . products purchased from unauthorized dealers that are not subject to Otter's quality controls."

127.    The Otter Warranty is a material component of genuine Otter Products.  Consumers who purchase Otter Products with the Otter Warranty receive the peace of mind that they are receiving a good quality product, that Plaintiffs stand behind the product, and that if a defect occurs, they will have the ability to have the product repaired or replaced.

128.    Consumers would find it material and relevant to their purchasing decision to know whether an Otter Product they were considering buying was covered by the Otter Warranty.  If a consumer knew a product did not come with the Otter Warranty, the consumer would be less likely to purchase the product.

**Defendants Are Not Authorized Sellers Or Authorized Online Sellers And Are Illegally Selling Products Bearing The Otter Trademarks**

129.    Because the unauthorized sale of Otter Products over the Internet threatens the reputation and goodwill associated with the Otter Trademarks, Plaintiffs actively monitor the sale of Otter Products online.

130.    Through these efforts, Plaintiffs discovered in or around July 2019 that high volumes of products bearing the Otter Trademarks were being illegally sold by Defendants on Amazon through a storefront called "Mac N' Cheese."

131.    Defendants are not Authorized Sellers of Otter Products and are not subject to, and do not comply with, Plaintiffs' Authorized Seller requirements or the Otter Rules.

132.    Defendants are also not Authorized Online Sellers of Otter Products and do not comply with the additional quality control requirements Plaintiffs impose on their Authorized Online Sellers.

133.    Defendants have not applied to be Authorized Online Sellers of Otter Products and Plaintiffs have not approved Defendants to be Authorized Online Sellers of their products.

134.    Defendants could not be approved as Authorized Online Sellers because they do not comply with Plaintiffs' requirements.

135.    Defendants do not comply with Plaintiffs' requirements because they do not operate an appropriately registered and recognized business that satisfies the credit, sales, history, and facility requirements that Plaintiffs require of their Authorized Online Sellers.

136.    Defendants do not comply with Plaintiffs' requirements because they do not have an acceptable online review history or business operating record.  As set forth below, multiple consumers have complained that Defendants are selling damaged, previously used, and other poor quality products.

137.    Despite not being approved as Authorized Sellers or Authorized Online Sellers and not meeting the quality control requirements Plaintiffs impose on their Authorized Sellers and Authorized Online Sellers, Defendants have sold, and continue to sell, products bearing the Otter Trademarks through their Amazon storefront.

138.     Defendants' Storefront offers products for sale as "Fulfilled by Amazon," often referred to as "FBA."  For example:



139.     The FBA service requires Defendants to ship their products to Amazon's warehouses and, if and when sold, the products are shipped by Amazon to the buyer.  Amazon does not contact sellers for approval of the purchase.  Defendants retain ownership of the products they store at Amazon warehouses until they are purchased by consumers.

140.     By selling items FBA, Defendants agreed to have their products stored across the country, including in any one of the four, soon to be five with the new 4-million-square-foot distribution and sorting center set to open mid-2021, Amazon fulfillment centers located in Colorado.  *See* Wayne Heilman, *Amazon buys Colorado site for massive distribution center*, OUT THERE COLORADO (Feb. 3, 2020), https://www.outtherecolorado.com/news/amazon-buys-colorado-site-for-massive-distribution-center/article_fd25a6ea-89a8-5b26-8a55-7745239b7170.html (last accessed Feb. 4, 2021).

**Defendants Are Selling Damaged, Previously Used, And Other Poor Quality Products Through Their Amazon Storefront**

141.    Customer reviews of Defendants' Amazon Storefront show that Defendants have sold products that were previously used, tampered with, damaged, improperly packaged, or otherwise different from what customers had ordered.

142.    For example, on January 16, 2021, Amazon user "Jack Harkness" complained that a product he purchased from Defendants' Amazon Storefront was "used" and had "[s]mudges and scratches on clear plastic face."

> ★★☆☆☆  "Item was used. Smudges and scratches on clear plastic face."
> By Jack Harkness on January 16, 2021.

143.    On December 25, 2020, Amazon user "Greg N." complained that a product he purchased from Defendants was not of the quality that he expected.

> ★☆☆☆☆  "Not really the product quality I thought I was getting."
> By Greg N. on December 25, 2020.

144.    On December 23, 2020, Amazon user "Travis Turner" complained that a product bearing the Otter Trademarks he purchased from Defendants was defective.

> ★★★☆☆  "I hate giving a bad rating but I have an S9 with the otter box case but these covers with the clip do not fit."
> By Travis Turner on December 23, 2020.

145.    On December 14, 2020, Amazon user "Macksmom" complained that a product she purchased from Defendants was "delivered to my front porch broken and shrink wrapped/packing taped," without a box.

> ★☆☆☆☆  "Not entirely sure how this item left the seller, but it delivered to my front porch broken and shrink wrapped/packing taped, no box."
> By Macksmom on December 14, 2020.

146.    On December 10, 2020, an Amazon customer complained that a product he purchased from Defendants did not fit his phone.



147.   On August 7, 2020, Amazon user "Brianna Mitchell" complained that a product she purchased from Defendants was defective and "[w]on't charge."



148.   On April 28, 2020, Amazon user "SM" complained that a product bearing the Otter Trademarks she purchased from Defendants was different from what she had ordered and did not fit her phone.

149.   On April 15, 2020, an Amazon customer complained that a product she purchased from Defendants was missing a "self adhesive screen protector" that was advertised as being included with the product.

150.   Additional other customers have complained of receiving products from Defendants' Amazon storefront that were damaged, defective, previously used, different from what was advertised, or of otherwise poor quality.

151.   These complaints about Defendants are typical of the complaints made about products sold and customer service provided by unauthorized sellers on online marketplaces. Plaintiffs allow their products to be sold only by Authorized Sellers, who are subject to and must follow the quality control and customer service requirements in the Otter Rules, to prevent

customers who purchase Otter Products from suffering experiences like those described in the above complaints about Defendants.

### Defendants Do Not Abide By Plaintiffs' Quality Controls
### And Customer Service Requirements

152.   Defendants do not abide by Plaintiffs' quality control and customer service requirements that Plaintiffs require Authorized Sellers to follow.

153.   Defendants do not comply with Plaintiffs' quality control requirements because they have not provided Plaintiffs their business information or given Plaintiffs an opportunity to vet them to determine if they meet Plaintiffs' high level of standards that they demand of their Authorized Online Sellers.

154.   Defendants do not comply with Plaintiffs' quality control requirements because they sell on Amazon without Plaintiffs' authorization or oversight.

155.   Defendants also do not comply with Plaintiffs' quality control requirements—and interfere with Plaintiffs' quality controls—because they have not disclosed to Plaintiffs where they acquire products that bear the Otter Trademarks and have not given Plaintiffs the right to audit and inspect their facilities and records.  As a result, Plaintiffs cannot determine if any products Defendants are selling or have sold are subject to a recall or consumer-safety information effort, and they also cannot obtain Defendants' assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

156.   Customer reviews of Defendants' Amazon Storefront show that Defendants have sold products—including products bearing the Otter Trademarks—that were damaged, tampered with, previously used, improperly packaged, different from what Defendants had advertised, or otherwise poor quality.  *See, e.g., supra* ¶¶ 141-150.  One of the two products bearing the Otter Trademarks that Plaintiffs purchased from Defendants' Amazon Storefront was also delivered

without Plaintiffs' packaging.   Accordingly, upon information and belief, Defendants are: (1) failing to comply with Plaintiffs' quality control requirements that prohibit Authorized Sellers from tampering with, altering, modifying, or relabeling products bearing the Otter Trademarks; and (2) failing to inspect and remove damaged, defective, counterfeit, previously used, or other poor quality products bearing the Otter Trademarks from their inventory.   Instead, Defendants are selling products bearing the Otter Trademarks that are damaged, tampered with, previously used, improperly packaged, or of otherwise poor quality.   These sales cause customers to write highly negative reviews of Otter Products in which they complain of receiving poor quality products, which harm Plaintiffs' reputation and hurt the placement of Otter Products in search results.

157.   Defendants do not comply with Plaintiffs' quality control storage requirements and do not store their products in accordance with the storage guidelines specified by Plaintiffs.

158.   Defendants do not comply with Plaintiffs' quality control requirements related to the handling, packaging, and shipping of products because they do not package and ship their products in accordance with Plaintiffs' requirements and package and ship products in a manner that allows them to become damaged.

159.   Defendants' failure to abide by the Otter Rules interferes with Plaintiffs' quality controls and prevents Plaintiffs from exercising control over the quality of products Defendants sell bearing the Otter Trademarks.  Plaintiffs cannot audit Defendants to ensure they are complying with Plaintiffs' quality controls or close Defendants' account if they fail to comply with Plaintiffs' quality control requirements.

160.   Defendants' failure to comply with the Otter Rules also interferes with Plaintiffs' quality controls because, unlike with its Authorized Online Sellers that Plaintiffs are able to

monitor through test purchases and other auditing actions, Plaintiffs cannot take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

161.    Defendants also do not comply with Plaintiffs' customer service requirements because they are not qualified or trained to accurately describe, demonstrate, and sell the products in their inventory and to advise customers on how to use Otter Products safely and properly.

162.    Defendants also do not comply with Plaintiffs' customer service requirements because they do not, and are unable to, provide the advice to consumers that Plaintiffs require of their Authorized Sellers and do not provide the type of ongoing support and response to consumer inquiries that Plaintiffs require of their Authorized Sellers.

163.    Defendants do not comply with Plaintiffs' quality control and customer service requirements because they do not take appropriate steps to address negative reviews from customers and do not cooperate with Plaintiffs in investigating negative product reviews.

**Defendants Are Infringing The Otter Trademarks By Selling Products Bearing The Otter Trademarks That Are Not Subject To, Do Not Abide By, And Interfere With Plaintiffs' Quality Controls And Customer Service Requirements**

164.    For all of the reasons set forth above, the products Defendants sell bearing the Otter Trademarks fail to adhere to the extensive and legitimate quality controls that Plaintiffs exercise over Otter Products to protect consumers and Plaintiffs' brand goodwill.

165.    The products sold by Defendants bearing the Otter Trademarks are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements.

166.    Because the products Defendants sell are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants sell are materially different from genuine Otter Products.

167.    Because the products Defendants sell are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants sell are not genuine Otter Products.

168.    Defendants' unauthorized sale of products bearing the Otter Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Otter Products, when, in fact, they are not.

169.    Defendants' unauthorized sale of products bearing the Otter Trademarks infringes on the Otter Trademarks and diminishes their value.

170.    Despite these facts, Defendants have sold, and continue to sell, products bearing the Otter Trademarks through their Amazon storefront without Plaintiffs' consent.

**Defendants Are Infringing The Otter Trademark By Selling Products Bearing The Otter Trademarks That Do Not Come With The Otter Warranty**

171.    As set forth above, genuine Otter Products purchased from Plaintiffs and their Authorized Sellers who comply with Plaintiffs' quality controls come with the Otter Warranty.

172.    Because Defendants are not Authorized Sellers of Otter Products and, thus, are not subject to Plaintiffs' quality control requirements, the products they sell bearing the Otter Trademarks do not come with the Otter Warranty.

173.    Because the products Defendants sell do not come with the Otter Warranty, they are materially different from genuine Otter Products.

174.    Defendants' unauthorized sale of products bearing the Otter Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Otter Products that come with the Otter Warranty, when, in fact, they are not.

**Defendants Are Engaging In False Advertising By Falsely Representing
That The Products They Sell Are "New" And Come With the Otter Warranty**

175.    In addition to infringing the Otter Trademarks, Defendants also falsely advertise
that the products they sell come with the Otter Warranty.

176.    Defendants' Amazon product listings for Otter Products state that the products are
covered by the Otter Warranty.  For example, Defendants are listing the following products that
specifically state that they come with the Otter Warranty:



42

177.     In addition to the language in the product listings, Defendants are also representing that their products come with the Otter Warranty because they have listed the products as "New." Pursuant to Amazon's policies, a "New" product listing comes with the "original manufacturer's warranty":

**New:**

Just like it sounds. A brand-new item. Original manufacturer's warranty, if any, still applies, with warranty details included in the listing comments. Original packaging is present for most New items but certain items like shoes may be re-boxed.

https://sellercentral.amazon.com/gp/help/external/200339950?language=en_US&ref=efph_2003
39950_cont_521.

178.     As set forth above, the products Defendants sell do not come with the Otter Warranty.  Thus, by representing to consumers that the products they sell are "New" and come with the Otter Warranty, Defendants are falsely advertising the products they are selling.

**Plaintiffs Have Repeatedly Attempted To Stop Defendants'
Illegal Sale Of Products Bearing The Otter Trademarks But Defendants
Continue To Willfully Infringe On The Otter Trademarks**

179.     After Plaintiffs discovered products bearing the Otter Trademarks being illegally sold on the "Mac N' Cheese" storefront, Plaintiffs investigated the storefront to determine who was operating the storefront.

180.     Because Defendants did not disclose their business or any contact information on their Amazon Storefront, Plaintiffs had to spend significant time and money investigating the storefront to attempt to identify the sellers connected to the storefront.

181.     After conducting an investigation, including serving a subpoena on Amazon to obtain the contact information that was provided by the operators of the Amazon Storefront, Plaintiffs identified Defendants Mendel Ichilevici, Andrea Ichilevici, Beny Ichilevici, and TX Trading Inc. as the owners and operators of the Amazon Storefront.

182.     Counsel for Plaintiffs sent cease-and-desist letters to Defendants on July 26, 2019, August 5, 2019, August 15, 2019, and August 30, 2019 that notified Defendants of their illegal conduct.  Plaintiffs' letters explained that Defendants were infringing on the Otter Trademarks and tortuously interfering with Plaintiffs' contracts by purchasing products from Authorized Sellers, who are prohibited from selling products to non-Authorized Sellers who resell the products. Plaintiffs' letters also demanded that Defendants permanently cease selling products bearing the Otter Trademarks and disclose every person and entity that provided Defendants with the products they had listed for sale.

183.     On or about September 1, 2020, Defendants' Amazon Storefront began listing contact information for the operators of the storefront as "Mendel Ichilevici, 20355 NE 34TH CT, APT 427, Miami, FL 33180 US," further confirming Defendants' involvement in the operation of the storefront.

184.     On October 13, 2020, counsel for Plaintiffs sent an email to Mendel Ichilevici that attached each cease-and-desist letter Plaintiffs had previously sent to Defendants.  Counsel explained that Plaintiffs had confirmed Defendants are behind the Amazon Storefront and demanded again that Defendants cease selling products bearing the Otter Trademarks.

185.     As of the time of filing, Defendants have not responded to any of Plaintiffs' communications and have continued to advertise and sell products bearing the Otter Trademarks through their Amazon Storefront without any abatement.

186.     Plaintiffs' July 26, 2019, August 5, 2019, August 15, 2019, and October 13, 2020 correspondence all provided notice to Defendants that Plaintiffs are located in Colorado and are harmed in Colorado by Defendants' illegal sales of infringing products bearing the Otter Trademarks.

187.    Although Defendants have been on notice of their infringing sales since mid-2019, Defendants have recently increased their volume of products bearing the Otter Trademarks, jumping to ***more than 200 products bearing the Otter Trademarks***.

188.    Upon information and belief, through their Amazon Storefront, Defendants accept and fulfill orders from Colorado residents for products bearing the Otter Trademarks and cause infringing products bearing the Otter Trademarks to be shipped to persons located in Colorado through the regular course of business.

189.    Defendants' conduct is typical of unauthorized sellers who know that they are engaged in unlawful conduct but choose to ignore letters in hopes that the trademark owner will not take legal action to stop their sales.  Defendants' disregard of Plaintiffs' cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

### Defendants Are Tortiously Interfering With Plaintiffs' Agreements With Their Authorized Sellers

190.    Plaintiffs sell Otter Products only to Authorized Sellers and end-user consumers

191.    Defendants are not Authorized Sellers, and have sold a high volume of products bearing the Otter Trademarks through their Amazon Storefront.

192.    Although Plaintiffs must take discovery in this action to learn how Defendants acquired the products bearing the Otter Trademarks that they have resold, based on these facts it is exceedingly likely that Defendants have obtained those products from one or more Authorized Sellers.

193.    Upon information and belief, Defendants have purchased Otter Products from Plaintiffs' Authorized Sellers for purposes of unlawfully infringing upon and materially damaging

the value of the Otter Trademarks by reselling the products on the Internet without Plaintiffs' approval.

194.    Plaintiffs' agreements with their Authorized Sellers prohibit Authorized Sellers from selling Otter Products to third parties who, like Defendants, are not Authorized Sellers of Otter Products but intend to resell the products anyway.

195.    Defendants were informed of this prohibition by at least July 26, 2019.  On or around that date, Defendants received a cease-and-desist letter from Plaintiffs.  The letter informed Defendants that the contracts between Plaintiffs and Plaintiffs' Authorized Sellers prohibit Authorized Sellers from selling Otter Products to any person or entity that, like Defendants, is not an Authorized Seller but intends to resell the products.

196.    Plaintiffs' letter also informed Defendants that, by purchasing Otter Products from an Authorized Seller for purposes of resale, they were causing a breach of the agreements between Plaintiffs and their Authorized Sellers and interfering with Plaintiffs' agreements and business relationships.

197.    Plaintiffs' letter also warned Defendants that if they continued to acquire Otter Products from Plaintiffs' Authorized Sellers for purposes of reselling them, they would be liable for tortiously interfering with Plaintiffs' contracts and/or business relationships.

198.    Despite being provided this information, Defendants have continued to acquire Otter Products from Plaintiffs' Authorized Sellers with the intent to resell them.

199.    Upon information and belief, Defendants do not disclose to Authorized Sellers that they intend to resell the Otter products they purchase from Authorized Sellers.

200.    Defendants have willfully and knowingly induced and are continuing to induce unknown Authorized Sellers to breach their agreements with Plaintiffs so that they can acquire Otter Products and unlawfully infringe upon the Otter Trademarks by reselling the products.

**Plaintiffs Have Suffered Significant Harm
As A Result Of Defendants' Conduct**

201.    As set forth above, the unauthorized sale of products bearing the Otter Trademarks through unauthorized sellers, such as Defendants, has caused significant harm to the OtterBox and LifeProof brands.

202.    When a consumer receives a non-genuine, damaged, or poor quality product that does not come with the Otter Warranty from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Plaintiffs.  As such, Defendants' ongoing sale of unauthorized products bearing the Otter Trademarks harms the OtterBox and LifeProof brands.

203.    Plaintiffs have suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions, including, but not limited to, loss of sales, damage to their intellectual property, and damage to their existing and potential business relations.

204.    Plaintiffs have suffered, and will continue to suffer, irreparable harm to their reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

205.    Plaintiffs are entitled to injunctive relief because Defendants will continue to unlawfully sell Otter Products and infringe on the Otter Trademarks, causing continued irreparable harm to Plaintiffs' reputation, goodwill, relationships, intellectual property, and brand integrity.

206.    Defendants' conduct was knowing, intentional, willful, malicious, wanton, and contrary to law.

207.    Defendants' willful violations of the Otter Trademarks and continued pattern of misconduct demonstrate intent to harm Plaintiffs.

**<u>FIRST CAUSE OF ACTION</u>**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(a)**

208.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs.

209.    Plaintiffs are the owners of the Otter Trademarks.

210.    Plaintiffs have registered the Otter Trademarks with the United States Patent and Trademark Office.

211.    The Otter Trademarks are valid and subsisting trademarks in full force and effect.

212.    Defendants have willfully and knowingly used, and continue to use, the Otter Trademarks in interstate commerce for purposes of selling products bearing the Otter Trademarks on the Internet without Plaintiffs' consent.

213.    The products Defendants sell bearing the Otter Trademarks are not authorized for sale by Plaintiffs.

214.    The products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty.

215.    Plaintiffs have established and implemented legitimate and substantial quality controls that genuine Otter Products must comply with.

216.    Plaintiffs abide by these quality controls and require all of their Authorized Sellers and Authorized Online Sellers to abide by these quality controls.

217.    Plaintiffs' quality controls are material, as they protect consumers and prevent them from receiving poor quality, damaged, and defective products.

218.     The products Defendants sell bearing the Otter Trademarks are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements.

219.     Because the products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty, and are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants sell are materially different from genuine Otter Products.

220.     Because the products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty, and are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants sell are not genuine Otter Products.

221.     Defendants' unauthorized sale of products bearing the Otter Trademarks interferes with Plaintiffs' quality controls and ability to exercise quality control over products bearing the Otter Trademarks.

222.     Defendants' unauthorized sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer come with the Otter Warranty and are subject to and abide by Otter's quality controls when, in fact, they do not.

223.     Defendants' unauthorized sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Otter Products when, in fact, they are not.

224.     Defendants' unauthorized sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products

Defendants offer for sale are sponsored by, authorized by, or otherwise connected with Plaintiffs when, in fact, they are not.

225.    Defendants' unauthorized use of the Otter Trademarks has infringed upon and materially damaged the value of the Otter Trademarks and caused significant damage to Plaintiffs' business relationships.

226.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and continue to suffer immediate and irreparable harm.  Plaintiffs have also suffered, and continue to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

227.    Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Otter Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

228.    Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

229.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Otter Trademarks.

### SECOND CAUSE OF ACTION
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

230.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs.

231.    Plaintiffs are the owners of the Otter Trademarks.

232.    Plaintiffs have registered the Otter Trademarks with the United States Patent and Trademark Office.

233.    The Otter Trademarks are valid and subsisting trademarks in full force and effect.

234.    Defendants have willfully and knowingly used, and continue to use, the Otter Trademarks in interstate commerce for purposes of selling products bearing the Otter Trademarks without Plaintiffs' consent.

235.    The products Defendants advertise and sell bearing the Otter Trademarks are not authorized for sale by Plaintiffs.

236.    The products Defendants advertise and sell bearing the Otter Trademarks do not come with the Otter Warranty.

237.    Plaintiffs have established and implemented legitimate and substantial quality controls that genuine Otter Products must comply with.

238.    Plaintiffs abide by these quality controls and require all of their Authorized Sellers to abide by these quality controls.

239.    Plaintiffs' quality controls are material, as they protect consumers and prevent them from receiving poor quality, damaged, and defective products.

240.    The products Defendants advertise and sell bearing the Otter Trademarks are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements.

241.    Because the products Defendants advertise and sell bearing the Otter Trademarks do not come with the Otter Warranty, and are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants sell are materially different from genuine Otter Products.

242.     Because the products Defendants advertise and sell bearing the Otter Trademarks do not come with the Otter Warranty, and are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants advertise and sell are not genuine Otter Products.

243.     Defendants' unauthorized advertisement and sale of products bearing the Otter Trademarks interferes with Plaintiffs' quality controls and ability to exercise quality control over products bearing the Otter Trademarks.

244.     Defendants' unauthorized advertisement and sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer come with the Otter Warranty and are subject to and abide by Plaintiffs' quality controls when, in fact, they are not.

245.     Defendants' unauthorized advertisement and sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants advertise and offer for sale are genuine Otter Products when, in fact, they are not.

246.     Defendants' unauthorized advertisement and sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants advertise and offer for sale are sponsored by, authorized by, or otherwise connected with Plaintiffs when, in fact, they are not.

247.     Defendants' unauthorized use of the Otter Trademarks has infringed upon and materially damaged the value of the Otter Trademarks and caused significant damage to Plaintiffs' business relationships.

248.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

249.    Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Otter Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

250.    Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

251.    Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Otter Trademarks.

**THIRD CAUSE OF ACTION**
**False Advertising**
**15 U.S.C. § 1125(a)(1)(B)**

252.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs.

253.    Plaintiffs are the owners of the Otter Trademarks.

254.    Plaintiffs have registered the Otter Trademarks with the United States Patent and Trademark Office.

255.    The Otter Trademarks are valid and subsisting trademarks in full force and effect.

256.    Through their Amazon Storefront, Defendants have willfully and knowingly used, and continue to use, the Otter Trademarks in interstate commerce for purposes of advertising, promoting, and selling Otter Products without Plaintiffs' consent.

257.    Defendants' advertisements and promotions of their products unlawfully using the Otter Trademarks have been disseminated to the relevant purchasing public.

258.    Defendants have used, and continue to use, the Otter Trademarks to falsely advertise that the products they sell, including, but not limited to, falsely advertising that the products they sell come with the Otter Warranty when, in fact, they do not.

259.    Otter Products purchased from Plaintiffs and their Authorized Sellers who comply with Plaintiffs' quality controls come with the Otter Warranty.

260.    Plaintiffs cannot exercise their quality controls over products sold by unauthorized sellers, such as Defendants.  As such, products bearing the Otter Trademarks that are sold by unauthorized sellers who do not comply with Plaintiffs' quality controls do not come with the Otter Warranty.

261.    The products Defendants sell bearing the Otter Trademarks are not authorized for sale by Plaintiffs.

262.    The products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty.

263.    Defendants falsely advertise that the products they sell bearing the Otter Trademarks come with the Otter Warranty.  As discussed above, Defendants' product listings specifically state they come with the Otter Warranty.  Defendants also advertise that the products they sell are "New" products that come with the Otter Warranty.

264.    These representations are false because the products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty.

265.    Defendants' use of the Otter Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Otter Trademarks misrepresents the

nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products come with the Otter Warranty when, in fact, they do not.

266.    Defendants' use of the Otter Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Otter Products that come with the Otter Warranty when, in fact, they are not.

267.    Defendants' use of the Otter Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Plaintiffs when, in fact, they are not.

268.    Defendants' unauthorized and deceptive use of the Otter Trademarks is material and likely to influence customers to purchase the products they sell, as consumers are likely to believe that products Defendants advertise using the Otter Trademarks are genuine Otter Products that come with the Otter Warranty when, in fact, they do not.

269.    Defendants' unauthorized use of the Otter Trademarks in advertising, and otherwise, infringes on the Otter Trademarks.

270.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

271.    Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Otter Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

272.     Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

273.     Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Otter Trademarks.

### FOURTH CAUSE OF ACTION
**Trademark Dilution**
**15 U.S.C. § 1125(c)**

274.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs.

275.     Otter is the owner of the OtterBox Trademarks.

276.     Otter has registered the OtterBox Trademarks with the United States Patent and Trademark Office.

277.     The OtterBox Trademarks are valid and subsisting trademarks in full force and effect.

278.     Otter filed the OTTERBOX® trademark in April 2009, and it was registered in May 2010.  Otter has actively, continuously, and exclusively used the OTTERBOX® trademark since that time.

279.     Otter has expended substantial time, effort, money, and resources advertising and promoting OtterBox Products with the OTTERBOX® trademark.

280.     Otter markets, advertises, and sells products using the OTTERBOX® trademark throughout the United States.

281.     The OTTERBOX® trademark is the means by which OtterBox Products are distinguished from others in the marketplace.

282.    The OtterBox name, brand, and image is well-recognized by consumers throughout the United States for Otter's mobile device cases and accessories, and outdoor products.

283.    Consumers recognize and associate the OtterBox name with quality.

284.    Otter has implemented legitimate and substantial quality controls that it requires all of its Authorized Sellers to follow to protect the OtterBox name and brand.

285.    Because of the quality, durability, and dependability of OtterBox Products and Otter's use of the OTTERBOX® trademark, consumers trust the OtterBox name and OtterBox Products.

286.    As a result of Otter's long, continuous, and exclusive use of the OTTERBOX® Trademark, the OTTERBOX® Trademark has acquired a secondary meaning associated by consumers and the public.

287.    Otter is widely recognized as the designated source of goods bearing the OTTERBOX® Trademark.

288.    For these reasons, since at least 2009, the OTTERBOX® Trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

289.    After the OTTERBOX® Trademark became famous, beginning in or around 2019, Defendants have willfully used the OTTERBOX® Trademark in connection with the unauthorized and illegal sale of products.

290.    The products Defendants sell bearing the OTTERBOX® Trademark do not come with the Otter Warranty and are not subject to, do not abide by, and interfere with Otter's quality controls.

291.    Because the products sold by Defendants do not come with the Otter Warranty and are not subject to and do not abide by Plaintiffs' quality controls, consumers who purchase

products from Defendants are more likely to receive a damaged, defective, or otherwise poor quality product and have an unsatisfactory customer experience.  Numerous customers have complained about receiving poor quality products from Defendants.

292.    Consumers who receive poor quality products that do not come with the Otter Warranty from Defendants associate that negative experience with Otter and the OTTERBOX® trademark.

293.    Consumers who receive such products from Defendants submit negative online reviews disparaging Otter and the OTTERBOX® trademark.  These negative reviews influence other consumers and cause them to become less likely to purchase OtterBox Products and cause them to become less likely to trust products bearing the OTTERBOX® trademark.

294.    As a result, Defendants' unauthorized and willful use of the OTTERBOX® trademark has tarnished and diluted the OTTERBOX® trademark.

295.    As a proximate result of Defendants' actions, Otter has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

296.    Otter is entitled to recover its damages caused by Defendants' infringement of the OTTERBOX® Trademark and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

297.    Otter is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Otter will suffer irreparable harm.

298.     Otter is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the OTTERBOX® Trademark.

### FIFTH CAUSE OF ACTION
### Common Law Trademark Infringement

299.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs.

300.     Plaintiffs are the owners of the Otter Trademarks.

301.     Plaintiffs have registered the Otter Trademarks with the United States Patent and Trademark Office.

302.     The Otter Trademarks are valid and subsisting trademarks in full force and effect.

303.     The Otter Trademarks are distinctive and widely recognized by the consuming public.  Otter Products are sold and purchased through Plaintiffs' website and their network of Authorized Sellers throughout the United States, including Colorado.

304.     Plaintiffs are widely recognized as the designated source of goods bearing the Otter Trademarks.

305.     Defendants have willfully and knowingly used, and continue to use, the Otter Trademarks in interstate commerce for purposes of selling products bearing the Otter Trademarks on the Internet without Plaintiffs' consent.

306.     The products Defendants sell bearing the Otter Trademarks are not authorized for sale by Plaintiffs.

307.     The products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty.

308.    Plaintiffs have established and implemented legitimate and substantial quality controls that genuine Otter Products must comply with.

309.    Plaintiffs abide by these quality controls and require all of their Authorized Sellers to abide by these quality controls.

310.    Plaintiffs' quality controls are material, as they protect consumers and prevent them from receiving poor quality, damaged, and defective products.

311.    The products Defendants sell bearing the Otter Trademarks are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements.

312.    Because the products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty, and are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants sell are materially different from genuine Otter Products.

313.    Because the products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty, and are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants sell are not genuine Otter Products.

314.    Defendants' unauthorized sale of products bearing the Otter Trademarks interferes with Plaintiffs' quality controls and ability to exercise quality control over products bearing the Otter Trademarks.

315.    Defendants' unauthorized sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer come with the Otter Warranty and are subject to and abide by Plaintiffs' quality controls when, in fact, they do not.

316.    Defendants' unauthorized sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Otter Products when, in fact, they are not.

317.    Defendants' unauthorized sale of products bearing the Otter Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with Plaintiffs when, in fact, they are not.

318.    Defendants' unauthorized use of the Otter Trademarks has infringed upon and materially damaged the value of the Otter Trademarks and caused significant damage to Plaintiffs' business relationships.

319.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

320.    Plaintiffs are entitled to recover exemplary damages because Defendants have acted with fraud, malice, and willful and wanton conduct.

### SIXTH CAUSE OF ACTION
### Deceptive Trade Practices Under Colo. Rev. Stat. § 6-1-101 *et seq.*

321.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs.

322.    Plaintiffs are the owners of the Otter Trademarks.

323.    Plaintiffs have registered the Otter Trademarks with the United States Patent and Trademark Office.

324.    The Otter Trademarks are valid and subsisting trademarks in full force and effect.

325.    Defendants have knowingly used, and continue to use, the Otter Trademarks in commerce in connection with the sale and advertising of products without Plaintiffs' consent.

326.    The products Defendants advertise and sell bearing the Otter Trademarks are not authorized for sale by Plaintiffs.

327.    The products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty.

328.    Plaintiffs have established and implemented legitimate and substantial quality controls that genuine Otter Products must comply with.

329.    Plaintiffs abide by these quality controls and require all of their Authorized Sellers to abide by these quality controls.

330.    Plaintiffs' quality controls are material, as they protect consumers and prevent them from receiving poor quality, damaged, and defective products.

331.    The products Defendants sell bearing the Otter Trademarks are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements.

332.    Because the products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty, and are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants sell are materially different from genuine Otter Products.

333.    Because the products Defendants sell bearing the Otter Trademarks do not come with the Otter Warranty, and are not subject to, do not abide by, and interfere with Plaintiffs' quality controls and customer service requirements, the products Defendants sell are not genuine Otter Products.

334.    Defendants knowingly used, and continue to use, the Otter Trademarks in commerce and in the course of their business to pass off their goods as those of Plaintiffs.

335.    Defendants knowingly used, and continue to use, the Otter Trademarks in commerce and in the course of their business, to make false representations as to source, sponsorship, approval and/or certification of their products.

336.    Defendants knowingly used, and continue to use, the Otter Trademarks in commerce and in the course of their business, to make false representations as to their affiliation, connection, or association with or certification by Plaintiffs.

337.    Defendants' use of the Otter Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of Plaintiffs because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, or otherwise connected with Plaintiffs.

338.    Defendants' unauthorized sale of products bearing the Otter Trademarks, and unauthorized use of the Otter Trademarks in advertising constitute unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*

339.    Defendants' unauthorized sale of products bearing the Otter Trademarks, and unauthorized use of the Otter Trademarks in advertising materially damages the value of the Otter Trademarks and causes significant damages to Plaintiffs' business relations.

340.    Defendants' unauthorized sale of products bearing the Otter Trademarks, and unauthorized use of the Otter Trademarks in the course of their business, vocation, or occupation

constitute unfair, deceptive, and unlawful trade practices in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 *et seq.*

341.     Defendants' unauthorized sale of products bearing the Otter Trademarks, and unauthorized use of the Otter Trademarks significantly impacts the public as actual or potential consumers of Otter Products.

342.     Plaintiffs have been damaged in the course of their business by Defendants' unfair, deceptive, and unlawful trade practices.

343.     Defendants have acted in bad faith and engaged in fraudulent, willful, knowing, and intentional conduct.

344.     Plaintiffs are entitled to recover damages, treble damages, and reasonable attorneys' fees and costs pursuant to Colo. Rev. Stat. § 6-1-113.

345.     Plaintiffs are entitled to recover exemplary damages because Defendants have acted with fraud, malice, and willful and wanton conduct.

## SEVENTH CAUSE OF ACTION
**Intentional Interference with Existing and/or Prospective Contract and Business Relations**

346.     Plaintiffs hereby incorporate the allegations contained in the foregoing paragraphs as if fully set forth herein.

347.     Plaintiffs sell Otter Products only to Authorized Sellers to end-user consumers.

348.     Plaintiffs have entered into agreements with Authorized Sellers to sell Otter Products. These agreements specifically prohibit Plaintiffs' Authorized Sellers from selling Otter Products to third parties, such as Defendants, who are not Authorized Sellers and who intend to resell the products.

349.     Defendants have sold a high volume of Otter Products through their Amazon Storefront.

350.    Plaintiffs have not, themselves, sold Otter Products to Defendants.

351.    Based on these facts, it is plausible and a reasonable inference that Defendants have purchased the Otter Products they are reselling, and have resold, from one or more of Plaintiffs' Authorized Sellers.

352.    Defendants know that Plaintiffs' agreements with their Authorized Sellers prohibit Plaintiffs' Authorized Sellers from selling Otter Products to any seller who, such as Defendants, is not an Authorized Seller and intends to resell the products.

353.    Defendants had notice of this prohibition by around July 26, 2019,through a cease-and-desist letter they received from Plaintiffs.

354.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly and willfully interfered with Plaintiffs' agreements with their Authorized Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants so they could resell them on the Internet.

355.    After being notified of this prohibition, Defendants intentionally induced one or more of Plaintiffs' Authorized Sellers to breach their agreements by continuing to acquire products from Plaintiffs' Authorized Sellers for the purposes of selling them on the Internet.

356.    In inducing Plaintiffs' Authorized Sellers to breach their contracts with Plaintiffs, Defendants acted with a wrongful purpose—specifically, unlawfully infringing upon and materially damaging the value of the Otter Trademarks by reselling the products they obtained from Authorized Sellers in violation of their contracts.

357.    Defendants also acted with wrongful means—specifically, upon information and belief, Defendants concealed and continue to conceal their intent to resell the Otter Products when they purchase them from Authorized Sellers.

358.    Because Authorized Sellers are prohibited by contract from selling products to persons or entities who are not authorized sellers but intend to resell the products, Authorized Sellers would not have sold products to Defendants if they had known that Defendants intended to resell those products.

359.    Defendants knew that Authorized Sellers would be breaching their agreements by selling products to Defendants for purposes of resale, and would accordingly consider Defendants' intent to resell material to their decision to sell products to Defendants.

360.    Accordingly, Defendants' concealment of their intent to resell products is a wrongful omission of a material fact, which wrongfully induced Authorized Sellers to breach their agreements with Plaintiffs.

361.    Because Defendants have refused to disclose how they have obtained the products bearing the Otter Trademarks they have resold, Plaintiffs must take discovery in this action to learn the specific identities of the Authorized Sellers that sold Otter Products to Defendants. Defendants, however, know the sources of the Otter Products they have obtained and the basis for Plaintiffs' claim of tortious interference.  Plaintiffs' agreements with their Authorized Sellers are a specific class of contract that Defendants caused Authorized Sellers to breach when they purchased Otter Products from Authorized Sellers for resale.

362.    Defendants' actions have caused injury to Plaintiffs for which Plaintiffs are entitled to compensatory damages in an amount to be proven at trial.

363.    Plaintiffs are entitled to recover exemplary damages because Defendants have acted with fraud, malice, and willful and wanton conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Judgment in favor of Plaintiffs and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.      That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

      i)      Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Otter Products;

      ii)      Prohibiting the Enjoined Parties from using the Otter Trademarks in any manner, including advertising on the Internet;

      iii)      Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Otter Products as well as any products bearing the Otter Trademarks;

      iv)      Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Otter Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing this trademark;

      v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any Otter Products, or the Otter Trademarks;

      vi)      Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any uses of the Otter Trademarks which associate Otter Products or the Otter Trademarks with the Enjoined Parties or the Enjoined Parties' website;

      vii)      Requiring the Enjoined Parties to take all action to remove unauthorized uses of the Otter Trademarks from the Internet, including from the website www.amazon.com; and

      viii)      Requiring the Enjoined Parties to destroy or return to Plaintiffs all products bearing the Otter Trademarks in their possession, custody, or control.

C.      An award of attorneys' fees, costs, and expenses;

D.      Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated this 19th day of February 2021.

                        Respectfully submitted,

                        *s / Martha L. Fitzgerald*
                        William D. Kloss, Jr.
                        Tyler B. Pensyl
                        Martha Brewer Motley
                        Vorys, Sater, Seymour and Pease LLP
                        52 East Gay Street

Columbus, Ohio 43216
Phone: (614) 464-6334
Facsimile: (614) 719-5072
Email: wdklossjr@vorys.com
　　　　tbpensyl@vorys.com
　　　　mbmotley@vorys.com

Martha L. Fitzgerald
Brownstein Hyatt Faber Schreck, LLP
410 Seventeenth Street, Suite 2200
Denver, Colorado 80202-4432
Phone: (303) 223-1472
Email: mfitzgerald@bhfs.com

*Counsel for Plaintiffs Otter Products, LLC and TreeFrog Developments, Inc.*